UNITED STATES DISTRICT COURT

IN THE DISTRICT OF IDAHO

| | |
|---|---|
| NEZ PERCE TRIBE and<br>IDAHO RIVERS UNITED<br><br>          Plaintiffs,<br>v.<br><br>UNITED STATES FOREST SERVICE,<br><br>          Defendant.<br>And<br><br>RESOURCES CONSERVATION<br>COMPANY INTERNATIONAL,<br><br>          Defendant-Intervenor | Case No. 3:13-CV-348-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

The Court has before it a motion for preliminary injunction filed by plaintiffs Nez Perce Tribe and Idaho Rivers United. The Court heard oral argument on the motion on September 9, 2013, and took the motion under advisement. For the reasons set forth below, the Court will order the defendant Forest Service to close Highway 12 to Omega-Morgan's mega-loads until certain conditions are met.

## SUMMARY

In August, a transport company, Omega-Morgan, proposed to transport a very large piece of equipment – referred to as a mega-load – over Highway 12. A portion of that Highway passes through the Nez Perce-Clearwater National Forests administered by the Forest Service, and along rivers designated for protection as Wild and Scenic Rivers –

**Memorandum Decision & Order – page 1**

the Middle Fork of the Clearwater and the Lochsa.  After reviewing Omega-Morgan's proposal, the Forest Service determined that the mega-load had the potential to affect the values it must protect.  It decided to conduct a review of the mega-load's impacts and consult with the Nez Perce Tribe, who hold treaty rights in the National Forest land.  To buy time, the Forest Service asked the State of Idaho to wait for that review before granting any permit.  The State ignored that request and granted the permit.  Although the Forest Service notified Omega-Morgan that it had not approved the load, Omega-Morgan nevertheless proceeded to transport the load.  The Forest Service let the load pass through the National Forests and took no enforcement action against Omega-Morgan.

Another Omega-Morgan mega-load is scheduled to proceed down Highway 12 on September 18, 2013.  The Nez Perce Tribe and Idaho Rivers United have brought this lawsuit against the Forest Service to stop that shipment.  In this decision, the Court orders the Forest Service to close Highway 12 (between mileposts 74 and 174) to the Omega-Morgan mega-load awaiting transport, until certain conditions have been met.  The grounds for this decision are discussed below.

## FACTUAL BACKGROUND

**Highway 12 and the Wild and Scenic River Corridor**

The Idaho segment of U.S. Highway 12 is a two-lane highway that runs 177 miles from the port of Lewiston east to Lolo Pass at the Montana border.  As the Highway leaves Lewiston and heads east, it follows the Clearwater River and passes through the Nez Perce Reservation.  After traveling through 70 miles or so of Reservation land, the

Highway picks up the Lochsa River and enters the Nez Perce-Clearwater National Forests, federal land regulated by the Forest Service.

The word "Lochsa" is a Nez Perce word meaning "rough water." The Nez Perce people hunted and fished in the Lochsa River area, and used trails along the River to travel to buffalo hunting grounds in Montana. *See Declaration of Whitman (Dkt. No. 10)* at p. 2. Later, the Lewis and Clark expedition used the Nez Perce trails in their travels west. *Id*. Although the National Forests are no longer part of the Nez Perce Reservation, the Tribe retains treaty rights in the lands, and the Forest Service manages these National Forests consistent with those treaty rights. As the Forest Service states on its website: "[The] Nez Perce people still maintain strong ties with their homeland and work cooperatively with us as stewards of the precious forest resources."[1]

The State of Idaho constructed the Highway in the 1950s and '60s. The Forest Service issued the State special use permits authorizing it to construct the Highway through the Forest. Until 1995, the State administered the Highway pursuant to these special-use permits and two memoranda of understanding.

In 1995, the Forest Service conveyed an easement to the FHWA, which it then conveyed to the State. The State recorded the Highway Easement Deed in 1997. The Deed grants the Idaho Transportation Department ("ITD") a right-of-way for the operation and maintenance of a highway through the Forest. The easement is subject to

---

[1] The Nez Perce-Clearwater National Forests website is found at http://www.fs.usda.gov/main/nezperceclearwater/workingtogether/tribalrelations

**Memorandum Decision & Order – page 3**

various conditions, including that the State shall "[p]rotect and preserve soil and vegetative cover and scenic and esthetic values on the right of way outside of construction limits."

The Highway runs along the Middle Fork of the Clearwater and Lochsa Rivers. Both rivers were designated as Wild and Scenic Rivers by the passage of the Wild and Scenic Rivers Act in 1968. *See* 16 U.S.C. § 1274(a)(1). The Act tasked the Forest Service with administration of these river systems "in such manner as to protect and enhance . . . [their] esthetic, scenic, historic, archeologic, and scientific features." 16 U.S.C. § 1281(a)

In an earlier decision in a related case, the Court held that the Forest Service must "*enforce* all relevant legal authorities, including, but not limited to, the Wild and Scenic Rivers Act . . . ." *See Judgment (Dkt. No. 64 in IRU v Forest Service 1:11-CV-95-BLW)(emphasis added)*. The Court held that under the Wild and Scenic Rivers Act, the Forest Service has the duty to "protect such rivers." 16 U.S.C. § 1283(a). The Forest Service must ensure that the designated rivers are "preserved in free-flowing condition." 16 U.S.C. § 1271. The State of Idaho operated Highway 12 under the terms of an easement granted by the Government. The Wild and Scenic Rivers Act requires that the easement be "related to the policy and purposes of the Act." 16 U.S.C. § 1284(g). As the protector of the designated rivers, the Forest Service has the authority to enforce all the relevant legal standards that govern the use of the National Forest and Wild and Scenic River corridor along Highway 12.

**Memorandum Decision & Order – page 4**

In response to that ruling, the Forest Service established criteria for determining when a large load would require agency review. Under these criteria, review would be triggered for loads that

1. Require traffic to be fully stopped (either on or adjacent to the highway) to allow passage of the oversized load, or

2. Require longer than 12 hours to travel through the Wild and Scenic River Corridor and National Forest ([mile posts] 74 to 174), or

3. Require physical modification of the roadway or adjacent vegetation to facilitate passage beyond normal highway maintenance.

*See Letter Dated June 17, 2013 (Dkt. No. 8).* The Forest Service applied these criteria to a Traffic Control Plan submitted by Omega-Morgan describing how it would convey mega-loads over Highway 12. Omega-Morgan is a heavy-hauling company under contract with Intervenor-Defendant Resources Conservation Company International (RCCI) to transport RCCI's large evaporators to a client in Canada. *See Declaration of Heins (Dkt. No. 21-2).* It proposed to transport loads that were 255 feet long, 21 feet wide, and 23 feet tall. *See Plan, Exhibit 7 (Dkt.No. 9).* The loads would each weigh about 644,000 pounds. *Id.*

After reviewing Omega-Morgan's Traffic Control Plan, Forest Supervisor Rick Brazell stated that "[t]he Omega-Morgan proposal triggers all of these criteria." *Id.* He stated that "[t]ransport of such [mega-]loads may impact visitor and traveler experiences and affect cultural and intrinsic values associated with the corridor." *See Letter Dated June 17, 2013 (Dkt. No. 8).* Observing that the impact of the mega-loads on those values

**Memorandum Decision & Order – page 5**

was "difficult to define," Supervisor Brazell concluded that "[u]ntil we have a clear understanding of these potential impacts, I cannot support authorization of such oversized loads through the National Forest or within the Wild and Scenic River corridor." *Id.*

The Forest Service and the ITD had a continuing dialogue over these criteria, resulting in the Forest Service replacing the first criteria with a size requirement for "loads greater than 16 feet wide or 150 feet long." *See Letter Dated July 26, 2013, Exhibit 6 (Dkt. No. 8).* During this dialogue, the ITD made it clear that it would issue permits without waiting for the Forest Service's review, and, after issuing its permit, would send the transport company to the Forest Service to obtain a separate permit.

The Forest Service took issue with that approach, arguing that it had no mechanism for issuing permits. In a letter to ITD dated July 26, 2013, the Forest Service interpreted the Court's earlier ruling as "putting the Forest Service in a review role, not a permitting one." *See Letter Dated July 26, 2013, Exhibit 6 (Dkt. No. 8).* The Forest Service envisioned a division of duties, where "the State is responsible for permitting and the Forest Service is responsible for reviewing prior to the State issuing permits." *Id.*

Despite the Forest Service's continuing pleas to ITD to wait for the Forest Service's review, the ITD issued a permit on August 2, 2013, to Omega-Morgan to transport a mega-load over Highway 12. The permit informed Omega-Morgan that a copy was being forwarded to the Forest Service for their review. Omega-Morgan informed the Forest Service that it intended to transport the load beginning August 5, 2013.

**Memorandum Decision & Order – page 6**

After reviewing this particular Omega-Morgan mega-load, the Forest Service notified Omega-Morgan, in a letter dated August 5, 2013, that the load met two of the three criteria and that until the Forest Service could conduct a full review, the Forest Service "does not consent, approve, or otherwise authorize Omega-Morgan to transport the subject over-legal loads on US Highway 12 between [mileposts] 74 and 174." *Id. See Letter dated August 5, 2013 (Dkt. No. 10).* The Forest Service told Omega-Morgan that the review would include (1) "a study examining such uses and their potential impacts to the intrinsic values of the corridor", and (2) "consultation with the Nez Perce Tribe." *Id.*

On August 5, 2013, the Nez Perce Tribal Chairman Silas C. Whitman called the Chief of the Forest Service, Tom Tidwell, and asked him to stop the shipment. Chief Tidwell declined, responding – according to Chairman Whitman – that "the Forest Service does not have the authority to close the State highway." *See Declaration of Whitman (Dkt. No. 10)* at ¶ 16. That statement was consistent with Brazell's earlier statement – quoted above – interpreting the Court's decision as "putting the Forest Service in a review role, not a permitting one." *See Letter Dated July 26, 2013, Exhibit 6 (Dkt. No. 8).* In other words, the Forest Service was taking the position that it had authority to review but not to enforce. Obviously, that was an erroneous reading of the Court's decision.

Later that evening, Omega-Morgan started its transport of the mega-load. It reached the National Forest and Wild and Scenic River corridor on August 8, 2013, passing through without encountering any Forest Service enforcement action.

**Memorandum Decision & Order – page 7**

After the mega-load had left the State, the Forest Service wrote a letter to the Tribe taking a different stance on the scope of its authority.  In that letter, dated August 12, 2013, the Forest Service recognized that it had authority to enforce its regulatory authority.  The agency told the Tribe that it had "made the discretionary decision not to seek enforcement action with respect to this shipment for a number of reasons." *See Letter Dated August 12, 2013 (Dkt. No. 34)*.  It went on to describe its ongoing consultation with the Tribe, and its corridor study, which should be completed by September 30, 2013.   The Forest Service explained that until its review was completed, "we have little basis to develop additional mitigation measures regarding the frequency or duration of such loads to address potential social, cultural, or aesthetic impacts." *Id.*

Omega-Morgan's next mega-load is scheduled for September 18, 2013.  While the ITD has not yet granted a permit for that load, given the ITD's past willingness to grant permits, it is highly likely that the ITD will grant a permit and that the mega-load will proceed on September 18, 2013.

The Tribe and IRU now seek a mandatory injunction to require the Forest Service "to enforce its already established jurisdictional authority to regulate the use of U.S. Highway 12 within the Nez Perce-Clearwater National Forest, and ensure that no transportation of mega-loads occurs on U.S. Highway 12 between Milepost 74 to Milepost 174 . . . until the Forest Service conducts the corridor impacts study and consultation with the Nez Perce Tribe it has already determined by agency directive are required prior to the transport of any additional mega-loads." *See Motion (Dkt. No. 5)*.

## LEGAL STANDARDS

To obtain a preliminary injunction, plaintiffs must establish that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest. *Winter v. Natural Resources Defense Council, Inc*., 555 U.S. 7, 20 (2008). Courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief. *Id*. at 24.

## ANALYSIS

The Forest Service has made two key decisions in this case. First, it decided to review the impacts of Omega-Morgan's mega-load, and consult with the Tribe, because the mega-load was so large and so slow it might affect the values the Forest Service must protect. *See Letter Dated June 17, 2013 (Dkt. No. 8)*(Forest Supervisor Brazell stated that "[t]ransport of such [mega-]loads may impact visitor and traveler experiences and affect cultural and intrinsic values associated with the corridor)". Second, it decided that until it completes that review and consultation, it will not consider enforcing its statutory authority to block these mega-loads.[2]

Plaintiffs are challenging the second decision. The Forest Service argues that there is no final agency action subject to review. Here, the Chief of the Forest Service denied the Tribe's plea to close the road by telling Chairman Whitman that the Forest

---

[2] The Court assumes, for the purpose of this proceeding, that the Forest Service now recognizes that it has the authority to enforce its statutory and regulatory power over Highway 12 between mileposts 74 and 174. That was not the case when the agency waved through the first Omega-Morgan shipment. The documents quoted above show that the agency believed it had no authority to enforce – an erroneous reading of the Court's opinion. But after that shipment was complete, it appears the Forest Service revised its position and is now correctly interpreting the Court's earlier decision.

**Memorandum Decision & Order – page 9**

Service had no authority to close the road.  That appears to be a final decision denying the request of the Tribe, and the Court finds it likely that the Tribe will prevail on this issue.  *See Oregon Natural Desert Ass'n v. U.S. Forest Service*, 465 F.3d 977, 982 (9th Cir. 2006).

Even so, the Forest Service argues, it is non-reviewable under *Heckler v. Chaney*, 470 U.S. 821 (1985).  That case held that "[a]n agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion."  *Id*. at 831.  The Forest Service argues that it made a decision not to enforce, and explained that in its letter dated August 12, 2013:  "The Forest Service has made the discretionary decision not to seek enforcement action with respect to this shipment for a number of reasons."  *See Letter Dated August 12, 2013 (Dkt. No. 34)*.  This decision not to take enforcement action, the Forest Service argues, is immune from review under *Heckler*.

Even under *Heckler,* an agency decision not to enforce is reviewable where "the agency has consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities."  *Heckler,* 479 U.S. at 833 n. 4.  The issue here is whether the plaintiffs' are likely to establish that the Forest Service's failure to consult with the Tribe before deciding not to exercise its enforcement authority was an "abdication of its statutory responsibilities."

Although the Nez Perce ceded the lands now encompassing the Nez Perce-Clearwater National Forests to the United States, "they did not relinquish rights to hunt, fish, and gather, or to practice traditional religious and cultural ceremonies on these

**Memorandum Decision & Order – page 10**

ancestral homelands." *See Nez Perce-Clearwater National Forest Website.*[3] Those rights are contained in the "Treaty with the Nez Perces, 1855", 12 Stat. 957 (1859) (securing to Tribal members the "right of taking fish at all usual and accustomed places" and "the privilege of hunting . . . upon open and unclaimed land"). The Forest Service recognizes these rights in describing its working relationship with the Tribe: "[The] Nez Perce people still maintain strong ties with their homeland and work cooperatively with us as stewards of the precious forest resources." *Forest Service Website, supra.*

This cooperative relationship is memorialized in the Forest Plans that govern these National Forests.[4] For example, the Clearwater Forest Plan directs the Forest Service to "[e]nsure that Forest actions are not detrimental to the protection and preservation of Indian Tribes' religious and cultural sites and practices and treaty rights." *See Forest Plan* at II-23.[5] The Forest Service has a statutory duty, under the National Forest Management Act (NFMA), to act consistently with this Forest Plan direction. *See* 16 U.S.C. § 1604(a)(i).

Overarching this statutory duty, is the Government's duty as trustee over the Tribe. The Supreme Court has held that the "constitutionally recognized status of Indians justifies special treatment on their behalf when rationally related to the Government's

---

[3] This official Forest Service website is found at http://www.fs.usda.gov/main/nezperceclearwater/workingtogether/tribalrelations

[4] The Nez Perce National Forest and the Clearwater National Forest were administratively combined in 2012.

[5] The Forest Plan for the Clearwater National Forest is a public document that can be found at http://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb5400608.pdf

**Memorandum Decision & Order – page 11**

unique obligation toward the Indians." *Washington v. Washington Commercial Passenger Fishing Vessel Assoc.,* 443 U.S. 658, 673 n. 20 (1979).

The Forest Service has recognized at least a part of its duty to the Tribe by starting the consultation process and the corridor study. The Forest Service initiated these actions because the Omega-Morgan loads were so large, and traveled so slowly, that they posed a potential threat to the values managed by the Forest Service. *See Letter Dated June 17, 2013 (Dkt. No. 8)*(wherein Forest Supervisor Brazell states that "[t]ransport of such [mega-]loads may impact visitor and traveler experiences and affect cultural and intrinsic values associated with the corridor)". Thus, under the Forest Plan, quoted above, the mega-loads at least had the potential to be "detrimental to the protection and preservation of Indian Tribes' religious and cultural sites and practices and treaty rights." *Forest Plan, supra,* at II-23.

All of this triggered a duty on the part of the Forest Service to consult with the Tribe. A meaningful consultation takes place "typically *before* undertaking a course of action." *California Wilderness Coalition v. U.S. Dept. of Energy*, 631 F.3d 1072, 1087 (9th Cir. 2011) (emphasis in original) (citations omitted). When the duty to consult runs to a Tribe, the federal agency generally must consult with the Tribe before taking the action at issue. *See Confederated Tribes & Bands of Yakima Indian Nation v. FERC*, 746 F.2d 466 (9th Cir.1984) (holding that consultation occurring after issuance of report affecting Tribe did not satisfy duty of federal agency to consult with Tribe).

Before consulting with the Tribe in this case, the Forest Service decided not to exercise its enforcement authority until its review and consultation are completed. The

**Memorandum Decision & Order – page 12**

practical effect of that decision is to wave through the next shipment set for September 18, 2013.  This may, in Forest Supervisor Brazell's own words, "impact visitor and traveler experiences and affect cultural and intrinsic values associated with the corridor." *See Letter Dated June 17, 2013 (Dkt. No. 8).*  To allow a shipment with that potential to proceed before consulting with the Tribe is likely an "abdication of statutory responsibilities," reviewable under *Heckler*.  *Heckler,* 479 U.S. at 833 n. 4.

Moreover, a consultation would be meaningless if held before the corridor study; otherwise, the Tribe goes into the consultation blind, being forced to guess about impacts.  Thus, the consultation must be conducted after the corridor study and before any further Omega-Morgan mega-loads pass through.

The Forest Service argues, however, that because it has no permit system in place, it cannot close the Highway by "withdrawing" a permit, having never granted a permit in the first place.  But the Forest Service does have the authority to issue closure orders for particular uses.  The Forest Service regulations grant authority to a Forest Supervisor to "issue orders which close or restrict the use of described areas within the area over which he has jurisdiction."  *See* 36 C.F.R. § 261.50.  The closure order is authorized to prohibit (1) "[u]sing a road for commercial hauling without a permit or written authorization," (2) "any type of vehicle prohibited by the order," and (3) "[o]perating a vehicle in violation of the speed, load, weight, height, length, width, or other limitations specified by the order."  *Id*. at § 261.54.

These regulations clearly contemplate a closure order that would apply only to a particular use, such as a mega-load.  To the degree that the Forest Service's litigation

**Memorandum Decision & Order – page 13**

position constitutes the agency's definition of its own regulations, the Court finds the interpretation unreasonable and hence unpersuasive. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc*., 467 U.S. 837, 843-44 (1984) (holding that an unreasonable interpretation by an agency of its regulations is not entitled to deference).

The Court has held that the Forest Service has enforcement authority over Highway 12 to the extent it passes through the Nez Perce-Clearwater National Forests – that is, between mileposts 74 and 174. The Forest Service thus has the authority to close that portion of Highway 12 to Omega-Morgan's mega-loads.

For all of these reasons, the Court holds that plaintiffs are likely to succeed on the merits. The Court also finds that they are likely to suffer irreparable harm if no injunction is issued. The plaintiffs are not seeking damages; they are seeking to preserve their Treaty rights along with cultural and intrinsic values that have no price tag.

The defendants argue, however, that the balance of equities tips in their favor, and that their injury from an injunction will be severe. Intervenor/Defendant RCCI argues that it if the Omega-Morgan loads are stopped, it could suffer losses of over $5 million. *See Declaration of Heins (Dkt. No. 21-2) at* ¶ 21. This is a reasonable estimate given the huge size of these loads – the equipment is obviously specialized and expensive. The size of this loss weighs heavy in the Court's analysis. It appears, however, that this loss could have been avoided.

In April of 2013, plaintiffs' counsel sent a letter to Omega-Morgan putting them on notice that they would be attempting to block any shipments down Highway 12 unless Omega-Morgan obtained permission from the Forest Service. *See Letter dated April 4,*

**Memorandum Decision & Order – page 14**

*2013 (Dkt. No. 38-1)*. The letter also described other shippers who incurred substantial expenses due to litigation delays over the use of Highway 12.

Two months before this letter, the Court had issued its decision of February, 2013, holding that the Forest Service had its own enforcement authority.  The Forest Service had decided in June of 2013 that it needed to conduct a further review before approving these mega-loads, and expressed its concern that they might affect the values it must protect.

RCCI decided, however, to proceed before the Forest Service could complete its corridor study and consultation with the Tribe.  In other words, RCCI knowingly put its loads into a position where the company would incur $5 million in losses if it must wait for the Forest Service review.  Given these circumstances, the Court cannot find that the balance of equities tips in defendants' favor.  In fact, it tips the other direction due to the clear command of the Tribe's Treaty rights, NFMA, and the Wild and Scenic Rivers Act.  For those same reasons, the Court finds that an injunction is in the public interest.

## Conclusion

The Court will grant the motion for injunction.  The Court will order the Forest Service to issue a Closure Order to Omega-Morgan pursuant to the Forest Service's authority under 36 U.S.C. § 261.50.  The Closure Order shall close Highway 12 between mileposts 74 and 174 to any Omega-Morgan mega-load, and shall remain in place until

the Forest Service has conducted its corridor review and consulted with the Nez Perce Tribe.[6]

## ORDER

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the motion for preliminary injunction (docket no. 5) is GRANTED.

IT IS FURTHER ORDERED, that the Forest Service issue a Closure Order to Omega-Morgan pursuant to the Forest Service's authority under 36 U.S.C. § 261.50. The Closure Order shall close Highway 12 between mileposts 74 and 174 to any Omega-Morgan mega-load, and shall remain in place until the Forest Service has conducted its corridor review and consulted with the Nez Perce Tribe.

IT IS FURTHER ORDERED, that the parties may contact the Court's clerk to set up an evidentiary hearing if necessary.

---

[6] The parties have all assumed that this Court must follow the standards for preliminary injunction set forth in *Winter*, quoted above. However, it is unclear whether the mandatory injunction sought by plaintiffs is governed by the law relating to writs of mandamus under 28 U.S.C. § 1361. *See Fallini v. Hodel*, 783 F.2d 1343 (9th Cir. 1986) (holding that relief seeking to command a federal agency to take affirmative action is governed by § 1361); 5 U.S.C. § 703 (including as a remedy a "mandatory injunction"). In any event, the result is the same. Mandamus relief is only available to compel an officer of the United States to perform a duty if (1) the plaintiff's claim is clear and certain; (2) the duty of the officer "is ministerial and so plainly prescribed as to be free from doubt," and (3) no other adequate remedy is available. *Patel v. Reno*, 134 F.3d 929, 931 (9th Cir.1997). There is nothing ambiguous about plaintiffs' claim seeking to block the mega-loads. The duty of the Forest Service to conduct a consultation after finding that the mega-loads might affect cultural and intrinsic values is commanded by Treaty rights, NFMA, and the Forest Plans – there is no discretion to refuse consultation. Finally, the plaintiffs are not seeking damages and there is no other adequate remedy besides blocking the mega-loads.

**Memorandum Decision & Order – page 16**



DATED: September 12, 2013

_____
B. Lynn Winmill
Chief Judge
United States District Court

**Memorandum Decision & Order – page 17**